# UNITED STATES DISTRICT COURT

SEP 2 3 2005

NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION

**FILED**
KC

UNITED STATES OF AMERICA

v.

BRUNO BERTUCCI

SEP 2 0 2005 **CRIMINAL COMPLAINT**

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

CASE NUMBER: **05CR0802**

**MAGISTRATE JUDGE VALDEZ**

I, <u>Brian J. Etchell</u>, the undersigned complainant being duly sworn, state the

following is true and correct to the best of my knowledge and belief.  On or about

<u>February 25, 2005,</u> at Chicago, in the <u>Northern</u> District of <u>Illinois</u> defendant,

> did corruptly endeavor to influence, obstruct, and impede the due administration
> of justice, namely, knowing that federal agents and the grand jury were
> investigating City of Chicago Bureau of Forestry activities, defendant directed
> and advised CW-4 to mislead federal agents by: (1) falsely telling agents that
> CW-4 did not remember certain facts; (2) never telling agents that BERTUCCI was
> involved in an attempted tree removal; and (3) never telling agents that BERTUCCI
> paid CW-4 one hundred dollars to remove a City tree;

in violation of Title ___18___ United States Code, <u>Section 1503(a)</u>.

I further state that I am a <u>Special Agent of the Federal Bureau of Investigation</u> and

that this complaint is based on the following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof:  ___**X**___ Yes  ___ No.

Signature of Complainant

Sworn to before me and subscribed in my presence,

<u>September 20, 2005</u>  at
Date

<u>Chicago, Illinois</u>
City and State

<u>MARIA VALDEZ, U.S. MAGISTRATE JUDGE</u>
Name & Title of Judicial Officer

Signature of Judicial Officer

STATE OF ILLINOIS      )
                       )      SS
COUNTY OF COOK         )

## AFFIDAVIT

I, Brian J. Etchell, being duly sworn, state as follows:

### Introduction

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been so employed since December 2003. I am currently assigned to a Public Corruption Squad in the Chicago Division of the FBI. In connection with my official duties, I have investigated violations of federal criminal law, including violations relating to public officials. I have also received training in the enforcement of laws concerning, among other things, public corruption and white-collar crime. I have received training and have participated in all of the normal methods of investigation, including, but not limited to, visual and electronic surveillance, the general questioning of witnesses, the use of informants, and undercover operations.

2.      This Affidavit is made in support of a criminal complaint charging BRUNO BERTUCCI, with a violation of 18 U.S.C. § 1503(a), charging BERTUCCI with obstruction of justice.

3.      The information contained in this Affidavit is based on my personal observations and experience in addition to information obtained from other law enforcement agents, witnesses, and documents.

4.      Since this Affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe BERTUCCI committed a violation of 18 U.S.C. § 1503(a).

1

Where statements of others are set forth in this Affidavit, they are set forth in substance and in part and are not verbatim. Statements from recorded conversations do not include all statements or topics covered during the course of the recorded conversations, and are not taken from a final transcript.

5.      As set forth in more detail below, in the Summer of 2004, federal agents and a federal grand jury were investigating a $5,000 bribe offered by John Boyle to CW-1, in exchange for CW-1 arranging to have two healthy, City-owned trees removed by a City of Chicago Bureau of Forestry crew. The developer of a construction project wanted the trees removed because they blocked a planned driveway on the property, but the Alderman and neighbors of the property opposed the removal of the trees. The investigation revealed that CW-1 contacted BRUNO BERTUCCI, a former supervisory official with the Bureau of Forestry, and offered BERTUCCI a share of the bribe proceeds. BERTUCCI then asked CW-4, a Forestry employee, to send a crew to 1905-1907 N. Burling, Chicago, to remove the trees under a false pretense of Aldermanic authority. A crew began to remove a tree, but was ordered to stop after a neighbor complained about the removal. After agents questioned CW-4, and CW-4 admitted his/her conduct, CW-4 consensually recorded a meeting with BERTUCCI in which BERTUCCI advised and directed CW-4 to lie to federal agents. BERTUCCI told CW-4 to falsely tell agents that CW-4 did not remember the details of the attempted tree removal, to not reveal that BERTUCCI was involved in the attempted tree removal, and to not reveal that BERTUCCI had paid CW-4 $100 in order to remove trees in the past.

6.      BRUNO BERTUCCI is a former employee of the City of Chicago ("the City"), who retired in or about Summer 2004 from the City's Department of Streets & Sanitation, Bureau of Forestry. BERTUCCI was appointed Assistant General Superintendent in the Bureau of Forestry in 1998.

7.     In connection with a federal grand jury investigation of the City's Hired Truck Program, federal law enforcement personnel investigated John Boyle. During the investigation, agents identified individuals involved with Boyle in the attempted bribery of former and current City officials in connection with the removal of two healthy, City-owned trees that blocked a proposed private construction project located at 1905-1907 N. Burling, a residential block in the Lincoln Park neighborhood of Chicago.

**Information Provided by Cooperating Witness-1 ("CW-1")**

8.     CW-1 is a former high-ranking employee within the City of Chicago. CW-1 made statements to the government pursuant to a proffer letter issued by the United States Attorney's Office. CW-1 understands that CW-1 will be charged with a crime, and has admitted to investigators that he/she committed mail fraud and bribery (in connection with the City of Chicago's Hired Truck Program). CW-1 provided information in the hopes that the government would consider CW-1's cooperation in deciding what charges will be filed against CW-1 and what sentence the government will seek for CW-1. The government has represented to CW-1 that it intends to recommend a reduced sentence for CW-1.

9.     CW-1 stated that he/she knew BRUNO BERTUCCI from working with the City, and that BERTUCCI had told CW-1 that BERTUCCI had taken down trees for people as favors. CW-1 also said he/she had been friends with Boyle for several years.[1]

10.     CW-1 said that in the Summer of 2004, Boyle called CW-1 and asked CW-1 if CW-1 could have some City trees removed on Burling Street in Chicago. In exchange, Boyle offered

---

[1]     CW-1 said that in 2001 and 2002, he/she accepted cash bribes from Boyle in exchange for favoring certain trucking companies with business through the City's Hired Truck Program.

3

$5,000 to CW-1, to share with whomever CW-1 needed to contact in order to have the City take down the trees. Boyle told CW-1 that Boyle could get more money if necessary.

11.     CW-1 said that he/she called BERTUCCI, and asked BERTUCCI to have the trees removed. CW-1 told BERTUCCI that they would split the money offered by Boyle. BERTUCCI agreed to have the trees taken down.

### Information Provided By Cooperating Witness-2 "CW-2" and Cooperating Witness-3 "CW-3"

12.     CW-2 is a private business owner, and works in the construction and demolition business, among other ventures. CW-2 voluntarily made statements to the government and testified before the grand jury. CW-2 initially made false statements to agents concerning the attempted removal of trees from 1905-1907 N. Burling, Chicago, Illinois, then later admitted that he/she had not told the truth and provided more detailed information. No promises were made to CW-2 concerning potential criminal liability in this investigation.

13.     CW-3 is a private business owner, and is a partner of CW-2. CW-3 voluntarily made statements to the government. CW-3 initially made false statements to agents concerning the attempted removal of trees from 1905-1907 N. Burling, then later admitted that he/she had not told the truth and provided more detailed information. No promises were made to CW-3 concerning potential criminal liability in this investigation.

14.     CW-2 said that he/she met John Boyle in 2003, and occasionally did demolition work for Boyle. CW-2 said that in June 2004, he/she worked on a construction project at 1905-1907 N. Burling Street, Chicago, Illinois, with his/her business partner, CW-3. Two trees on the City parkway in front of the property blocked the planned construction of a driveway. CW-2 said CW-3 was unable to get a permit to have the trees removed. CW-2 said he/she told Boyle about the

4

problem with the trees, and Boyle told CW-2 that he could have the trees taken down. Boyle told CW-2 that it would cost $5,000. CW-2 agreed to pay Boyle $5,000 to have the trees removed.

15.     CW-2 spoke to Boyle repeatedly about getting the trees removed. Boyle gave CW-2 a telephone number and told CW-2 to speak to "BRUNO." CW-2 called the number and spoke to BRUNO. CW-2 told BRUNO that CW-2 was calling at Boyle's instruction. BRUNO told CW-2 that removals would not normally be a problem, but because of the particular street on which the trees were located, BRUNO was having some difficulty.

16.     CW-3 said that he/she was a partner of CW-2's, and involved in building new single-family homes at 1905-1907 N. Burling, Chicago, Illinois. In front of the property, on the City parkway, were two trees that CW-3 wanted removed in order to put in driveways for the new buildings. CW-3 said that he/she tried for months to have the Bureau of Forestry remove the trees, but was unsuccessful.

17.     According to documents obtained from the City of Chicago, as of July 11, 2004, one tree was approximately 36 inches in diameter, and the other was approximately 14 inches in diameter. Based on agent observations, the larger tree appeared to be approximately 30 feet tall.

18.     CW-3 said that he/she and CW-2 spoke to Boyle about the trees. Boyle said he would take care of the trees for $5,000. CW-3 said he/she understood that this payment was not being made through official City channels in order to obtain proper approvals for the removal, but that instead, Boyle was using some connection at the City to get the trees removed. CW-3 said that since this was not "on the up-and-up," he/she tried to conceal the attempt to have the trees removed.

19.     CW-3 said that a City crew came out to the property and attempted to remove one of the trees. CW-3 did not recall the specific date, and neither CW-2 nor CW-3 were present at the site

when the crew came to 1905-1907 N. Burling. CW-3 said that he/she heard from another individual involved in the project that when the crew began to remove the trees, the neighbors complained, and the crew left without completing the tree removal.

20.    CW-3 said that after the crew attempted to cut down the trees, CW-2 gave CW-3 the phone number for "BRUNO," who CW-3 understood to be Boyle's contact regarding the trees. CW-3 said that he/she told BRUNO that there was too much attention on the trees, and he/she did not want to pursue the removal through BRUNO.

21.    CW-2 said that he/she did not pay Boyle any money for the tree removal.

**Physical Surveillance of the Trees**

22.    On July 21, 2004, FBI agents conducted surveillance at 1905-1907 N. Burling. At approximately 7:42 a.m., an agent observed a City of Chicago Streets & Sanitation truck parked at 1905-1907 N. Burling, and saw the truck depart from the location at approximately 7:50 a.m. At approximately 8:30 a.m., a different City of Chicago truck arrived at the 1900 block. An unidentified male exited the truck, and placed five orange cones to block traffic on Burling. The City of Chicago truck parked at 1905-1907 N. Burling.

23.    An agent approached a City employee standing near the City truck. The employee confirmed the trees were being removed.

24.    At approximately 8:40 a.m., agents observed and photographed orange-vested City workers begin to remove one of the trees. One worker was in a crane that extended into the higher branches of the trees. The worker in the crane cut a large branch from a tree and it fell to the ground.

6

25. At approximately 8:54 a.m., agents observed the City crew preparing to depart. At 9:30 a.m., agents observed and photographed the debris and cut branches from the trees at 1905-1907 N. Burling. The trees had not been removed.

**Information Provided by CW-4**

26. CW-4 is an employee within Streets & Sanitation, Bureau of Forestry. CW-4 voluntarily made statements to agents concerning his/her participation in the attempted removal of trees at 1905-1907 N. Burling and his/her contacts with BRUNO BERTUCCI. CW-4 initially gave false statements to agents, but promptly admitted that his/her initial answers to questions were false. No promises have been made by the government to CW-4 concerning potential criminal liability in this investigation.

27. CW-4 said that every Alderman has the discretionary authority to request the removal of City-owned trees in the Alderman's ward. The Bureau of Forestry honors these requests up to 20 trees per year. Aldermanic requests are submitted to the Bureau of Forestry. Records are maintained in a computer system documenting the tree removal request. An inspector is dispatched to look at the tree and to make sure the property owner concurs with the tree removal. A crew is then dispatched to remove the tree, based on the Aldermanic discretionary authority to remove trees. (The tree need not be diseased or damaged in order to be removed pursuant to Aldermanic authority.)[2]

28. CW-4 said that BRUNO BERTUCCI, who was a former Assistant General Superintendent at Forestry, asked CW-4 to remove the trees at 1905-1907 N. Burling because "it's

---

[2] According to information available on the City of Chicago's website in Summer 2004, in response to a request to remove a tree, "A City inspector will check trees on the public way to determine if they are dead or diseased. The inspector will order the removal of dead or dangerous trees. If a tree is not dead or diseased the City will not remove it."

for a friend." BERTUCCI added words to the effect of, "I'll take care of you." CW-4 understood BERTUCCI to mean that he would pay CW-4.

29.     CW-4 agreed to initiate the removal of the trees at Burling, at BERTUCCI's request. CW-4 ordered the removal of the trees, documenting the removal as an Aldermanic discretionary, even though the Alderman had not ordered the removal.

30.     On the morning that the crew was removing the trees at Burling, another Forestry employee told CW-4 that the neighbors were complaining and that the Alderman's office said that the Alderman had not ordered the removal. CW-4 then arranged to have the crew stop the removals.

31.     CW-4 called BERTUCCI after CW-4 put a halt to the removal. CW-4 told BERTUCCI there was "too much heat," and they could not remove the trees. BERTUCCI was upset and CW-4 believed that BERTUCCI wanted CW-4 to continue to try to take down the trees. BERTUCCI never paid CW-4 any money for the attempted removal.

32.     CW-4 said that he/she deleted records in the City computer system related to the 1905-1907 N. Burling tree removal after the failed attempt to remove the trees.

33.     CW-4 said that he/she had successfully caused the removal of a living tree at BERTUCCI's request in the past, and falsely documented that removal as an Aldermanic discretionary. CW-4 said that this removal occurred in 2004. Earlier in 2004, CW-4 caused the removal of a dead tree at BERTUCCI's request. Upon each request, BERTUCCI said words to the effect of either "this is for a friend" or "this is for me," indicating that the removals were not pursuant to official City business. CW-4 said that approximately one month after CW-4 successfully caused the removal of the live tree, BERTUCCI gave CW-4 $100 in cash. CW-4 understood that BERTUCCI was paying CW-4 $50 for each tree removal CW-4 caused at BERTUCCI's direction.

34.     CW-4 said that he/she agreed to BERTUCCI's requests because CW-4 feared that BERTUCCI could cause CW-4 to be transferred to a less desirable position with the City.

35.     After the unsuccessful tree removal at Burling, BERTUCCI gave CW-4 a list of three addresses where he wanted trees removed. CW-4 said he/she threw away the list and did not initiate removals at those locations for BERTUCCI.

## BERTUCCI's Recorded Statements of Obstruction

36.     On February 25, 2005, CW-4 was equipped with a recording device, and at the direction of federal agents, met with BERTUCCI. CW-4 explained to BERTUCCI that the FBI had come to Forestry and CW-4's home asking questions and "they're subpoenaing records. All the records about Burling." CW-4 told BERTUCCI that CW-4 told agents that "I got [the removal request] from the Alderman's office." CW-4 expressed his/her fear that the agents had checked with the Alderman's office.

37.     BERTUCCI replied, "Whatever you do, you just stick with your story, and say, 'Hey listen, I got a phone call. . . . I don't remember when this was. I don't remember. . . .'" CW-4 said, "if the Alderman says that she didn't get it, then they know that I'm lying and that they come back to me, and ask me. . . . I need a story to stick to."

38.     BERTUCCI replied, "Listen to me. Don't get, don't get crazy. . . . I'm gonna tell you why, why they're so interested in this job. Because Johnny Boyle and [Individual A] are involved. That's who they're looking for. . . . What they're looking is to prove that these guys were taking money or giving money to people." CW-4 said, "I'm scared man."

39.     BERTUCCI replied, "All you do is stick to your story, the way you did it. You just stick to your story because there ain't no way they could prove anything. Say, 'Wait a minute, I

9

don't know what happened. I'm so busy up here, I really don't remember. I probably got a call.'"
BERTUCCI added, "And use 'probably.'"

40.     BERTUCCI said, "You know what they're looking for? Is that John Boyle maybe
paid some money. . ." CW-4 said, "Well, who would they pay off in Forestry? He didn't pay me
off." BERTUCCI replied, "Me. Yeah, but see they got nothing to go on."

41.     Later in the conversation, BERTUCCI advised CW-4, "You just do what I tell you
to do. If they question you anymore. . . . They may be back in six months, okay?" BERTUCCI also
said, "Listen to me, listen to me, the tree's still up. Okay. Now, if they come to you and they say,
'Listen we got all the records. Who was sent out?' [You say,] 'I don't know why. I don't remember.
What are you talking about? Well, I can't remember.'" CW-4 said, "I told [my supervisor] I got a
call from [the Alderman's assistant]." BERTUCCI replied, "Well, then you put her down. Say,
'Listen, I had a call from the 43rd Ward or whatever. . .'"

42.     BERTUCCI also told CW-4, "I didn't know they were coming after the Burling job.
I didn't know that. . . . There was another job too, that I pulled off on. You know, I says, forget
about it. . . . Don't worry about it. Don't let these guys scare you. Just remain calm and you say,
'Hey, do you know how many phone calls I get?' Say, 'Spend the day up in this office. . . . And see
what I deal with sometime. . . . And if I put down [the Alderman's assistant], I honestly might've
thought it was [the Alderman's assistant]. . . . I honestly thought it was [the Alderman's assistant].
Maybe it wasn't. I don't know. I don't remember that day. I'm not saying I didn't do it. . . . It's
rectified, the tree's still standing.' [The agents may say,] 'Well, we want to know who gave the
order.' [You say,] 'I don't know. If I knew, I'd tell you.'"

43.     BERTUCCI said, "If worse come to worst, say, 'Wait a minute, what are you talking to me for? . . . I'm a worker. I take orders.'" To which CW-4 replied, "I was just taking orders from you, man." BERTUCCI then said, "Yeah, but I was retired. . . . Don't ever say that. [Laughter] Don't say that, you're doing what a retired guy says. Listen to me, I'm telling you what they're after, who they're after. They're not after you. . . ."

44.     BERTUCCI told CW-4, "You just play it dumb."

45.     At the end of the conversation, as CW-4 was leaving, BERTUCCI said, "And don't never say I gave you that hundred neither. [Laughter]."

**Conclusion**

46.     Based on the facts described above, I submit that there is probable cause to believe that, on or about February 25, 2005, BRUNO BERTUCCI did corruptly endeavor to influence, obstruct, and impede the due administration of justice, namely, knowing that federal agents and the grand jury were investigating City of Chicago Bureau of Forestry activities, defendant directed and advised CW-4 to mislead federal agents by: (1) falsely telling agents that CW-4 did not remember certain facts; (2) never telling agents that BERTUCCI was involved in an attempted tree removal; and (3) never telling agents that BERTUCCI paid CW-4 one hundred dollars to remove a City tree; in violation of 18 U.S.C. § 1503(a).

FURTHER AFFIANT SAYETH NOT.

BRIAN J. ETCHELL
Special Agent
Federal Bureau of Investigation

SUBSCRIBED AND SWORN TO BEFORE ME
This 20th day of September 2005

MARIA VALDEZ
United States Magistrate Judge

11